IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TAJMIR PARKS and ROSELMY RODRIGUEZ, Plaintiffs, | : : : | CIVIL ACTION |
| | : | No. 25-cv-263-JMY |
| v. | : : | |
| PA STATE TROOPER ROBERTO ARIAS-GARCIA, et. al., Defendants. | : : : : : | |

**MEMORANDUM**

**Younge, J.**                                                                                     **June 24, 2026**

When on a routine patrol, Pennsylvania State Police Troopers Anthony Lannutti ("Lannutti") and Roberto Arias-Garcia ("Arias-Garcia") (collectively, "Defendants") ran the license plate of a Ford Taurus and discovered the car was registered to a woman with an active warrant for a violent felony. Defendants initiated a high risk stop, which involved cutting off the Taurus, drawing their guns, and handcuffing the vehicle's occupants, Tajmir Parks ("Parks") and Roselmy Rodriguez ("Rodriguez") (collectively, "Plaintiffs"). After several minutes, Defendants confirmed that neither Plaintiff was the target of their search and released both of them. Plaintiffs have brought suit, claiming that Defendants' conduct constituted excessive force and false imprisonment in violation of Plaintiffs' Fourth Amendment rights. Currently before this Court is Defendants' motion for summary judgment, ECF No. 25 ("Motion"), as well as various filings in support of and in opposition to that Motion, ECF Nos. 29, 30, 31, 32, 33.[1]  While this Court

---

[1] When applicable, the Court adopts the pagination supplied by the CM/ECF docketing system, which does not always match the document's internal pagination.

1

understands that Plaintiffs allege they suffered substantial trauma and other injuries as a result of this unfortunate incident, Defendants' Motion is granted because the doctrine of qualified immunity shields Defendants from liability in this suit.[2]

## I.    Background

### A.    Factual Background[3]

This case arises from Defendants' stop of Plaintiffs' vehicle and Defendants' treatment of Plaintiffs during that stop, which Plaintiffs allege constituted excessive force and false imprisonment.

#### 1.    *Defendants Identify Vehicle Registered to Person with Active Warrant*

On the evening of February 24, 2023, Pennsylvania State Police Trooper Anthony Lannutti was on a routine patrol on Interstate 76 Eastbound ("I-76") near Upper Merion, Pennsylvania. ECF No. 25-1 ("Def. SMF") ¶ 1. Lannutti observed a Ford Taurus driving ahead of him. *Id.* ¶ 4. Lannutti ran the Taurus' license plate, as is routine while on patrol, and discovered that the vehicle was registered to Rhonda Alvin ("Alvin") and Tajmir Parks. *Id.* ¶ 7; ECF No. 30 ("Pl. Resp. to Def. SMF") ¶ 7. Lannutti saw that Alvin had an active warrant issued by the Philadelphia Police Department for aggravated assault involving the use of a firearm, a serious felony warrant. Def. SMF ¶ 7. A flag indicated that Alvin was "armed and dangerous" and owned two firearms, despite her permit to carry those firearms having been revoked. *Id.* According to Plaintiffs, Lannutti's computer system also would have alerted Lannutti to the fact that Alvin was a 43-year-old black female with a head tattoo. Pl. Resp. to Def. SMF ¶ 5.

---

[2] The Court finds this Motion appropriate for resolution without oral argument.  Fed. R. Civ. P. 78; L.R. 7.1(f).

[3] The information provided in this section comes from the parties' statements of fact that have not been disputed by the other party. Disputed facts are indicated as such.

### 2.    *Defendants Execute a Stop of the Vehicle*

At 6:56 PM, Lannutti sent a radio transmission requesting backup. Def. SMF ¶ 8. Lannutti considered the stop to be "high risk" because its purpose was to apprehend an offender with a warrant for a violent crime using a firearm and because the offender was said to be "armed and dangerous" and may unlawfully have been in possession of firearms. *Id.* Trooper Arias-Garcia arrived at Lannutti's area shortly thereafter. *Id.* ¶ 9.

Mobile Video Recorder ("MVR") footage from Lannutti's vehicle shows that Lannutti moved from the left lane, behind the Taurus, to the right lane, and drove parallel to the Taurus. *Id.* ¶ 10. The parties agree that it "was dark out," *Id.* ¶ 5, and the Taurus' windows were "up" and "dark," but the nature and extent of tint and what was observable within the Taurus are in dispute, Pl. Resp. to Def. SMF ¶ 4. According to Defendants, Lannutti tried to determine who was in the Taurus. Def. SMF ¶ 11. He could see that the Taurus was occupied by a male driver and a female passenger, but he could not determine the occupants' ages, races, or ethnicities or whether Alvin was in the vehicle. *Id.* Plaintiffs counter that Lannutti did not make reasonable efforts to determine the Taurus' occupants and merely looked once through the passenger side window while driving. Pl. Resp. to Def. SMF ¶ 11.

Lannutti activated his lights and sirens and entered the left lane ahead of the Taurus, where he stopped and reversed to get closer to the Taurus. Def. SMF ¶¶ 13–14. Arias-Garcia also activated his lights and parked his vehicle behind the Taurus, so as to block the Taurus in. *Id.* ¶¶ 13, 15. No Precision Immobilization Technique ("PIT") was attempted, though Plaintiffs assert they felt threatened by the possibility of such a maneuver, Pl. Resp. to Def. SMF ¶ 16, and that the stop "almost caused" a vehicle collision, ECF 29 ("Pl. Opp'n Br.") ¶ 10.

3

The MVR captures Lannutti's observations until he parked in front of the Taurus and thereafter shows the front-facing view of the roadway ahead of Lannutti's vehicle. Def. SMF ¶ 17. Thus, after Lannutti parked, the MVR contributes only partially discernable audio of the Defendants' interaction with Plaintiffs. *See* Pl. Resp. to Def. SMF ¶ 17.

### 3. *Defendants Order Plaintiffs Out of the Vehicle*

Lannutti exited his vehicle and said, "let me see your hands." Def. SMF ¶ 18. Lannutti ordered the occupants to show their hands for safety reasons. *Id.* Lannutti gave the occupants multiple commands to put their hands out the car windows. *Id.* Lannutti wanted to make sure that neither had a weapon, and that he would be able to see if either reached for one. *Id.* Defendants then approached the Taurus with their guns drawn. Pl. Resp. to Def. SMF ¶ 19. Lannutti approached the passenger, Rodriguez, while Arias-Garcia approached the driver, Parks. Def. SMF ¶ 20.

Arias-Garcia ordered Parks out of the Taurus and handcuffed him. Def. SMF ¶ 21. According to Plaintiffs, Arias-Garcia did so "aggressively" by "pull[ing] and dragg[ing] Parks out of the vehicle "with a gun pointed at his head causing him to fall on the highway." Pl. Opp'n Br. ¶ 18.

Lannutti opened Rodriguez's door and ordered her to get on the ground. Def. SMF ¶ 25. According to Defendants, this involved, "grabb[ing] hold of Rodriguez's wrist and forearm as she exited the vehicle for officer safety purposes in case she became non-compliant." *Id.* In Plaintiffs' telling, "Lannutti yanked Ms. Rodriguez out of the vehicle by her right arm and threw-pushed her onto the middle lane of highway I-76 while pointing his gun at her head." Pl. Resp. to Def. SMF ¶ 25. Lannutti told Rodriguez to get on the ground and that she was "just being detained." Def. SMF ¶ 27. Rodriguez told him that she was pregnant and that she could not lay flat. *Id.* ¶¶ 26, 29.

Lannutti responded that he would "get [her] up." *Id.* ¶ 29. Lannutti then helped Rodriguez to her feet, and stated "alright, let's get up," "I'll help you up," and "I got you." *Id.* In total, Rodriguez was on the ground for approximately thirty-two seconds. *Id.* ¶ 30.

4.      *Defendants Detain Plaintiffs While Determining Their Identities*

After helping Rodriguez up, Lannutti asked Rodriguez what her name was. Def. SMF ¶ 31. Rodriguez responded with her name and directed Lannutti to where her bag was in the car with her wallet and license. *Id.* Lannutti asked for permission to open her purse. *Id.* At her deposition, Rodriguez testified that she gave Lannutti permission to get her license. *Id.* Lannutti then asked Rodriguez who the car belonged to. *Id.* ¶ 32. Rodriguez said it belonged to her child's father. *Id.* Lannutti explained to Rodriguez that the owner of the vehicle had a serious warrant out for her arrest. *Id.* ¶ 33. At her deposition, Rodriguez recalled that she knew the Taurus was registered to Alvin. *Id.* Lannutti asked Rodriguez, "are you okay? You're not injured?" *Id.* ¶ 34. Rodriguez did not tell him that she was injured or in any pain. *Id.* Rodriguez testified that she could not recall if she was injured but remembered that she told Lannutti she was "fine." *Id.* Lannutti then directed Rodriguez to walk with him to the rear of Arias-Garcia's vehicle and sit on the bumper. *Id.* ¶ 35.

Lannutti then asked Parks if the Taurus belonged to him. *Id.* Parks identified himself, and told Lannutti that the car is registered to him and his mother. *Id.* Lannutti asked Parks for his mother's name, and he responded "Rhonda Alvin." *Id.* Parks asked Lannutti if his mother had a warrant, and Lannutti responded, "yes." *Id.* During this interaction, Parks expressed shock that Defendants were pointing guns at him and Rodriguez. *See id.* ¶ 37. Lannutti responded that this was because it was a high risk stop involving a serious warrant, that the warrant belonged to a woman, and while he could see a woman in the car, he could not tell if she was the person with the warrant. *Id.* Parks reminded Lannutti that Rodriguez was pregnant and that he needed to be

careful with her, to which Lannutti responded, "yes, yes, absolutely, absolutely." *Id.* ¶ 38. Arias-Garcia asked Parks if his wallet was in the car, and Parks told Lannutti where to find his license. *Id.* ¶ 39.

Lannutti asked Rodriguez, "you don't have anything on you, right?" and then proceeded to take the handcuffs off of her. *Id.* ¶¶ 40–42. Rodriguez was handcuffed for at most three minutes and thirty-one seconds. *Id.* ¶ 43.

Arias-Garcia then went back to his car to run Parks' and Rodriguez's licenses to confirm their identities and make sure they did not have any warrants. *Id.* ¶ 46. Lannutti noted that he and Arias-Garcia would be leaving shortly and apologized to Plaintiffs for the inconvenience. *Id.* ¶ 47. "It's a serious warrant, okay? We're just doing a high risk stop and I don't want anyone to get hurt," Lannutti said. Lannutti then took the handcuffs off of Parks. *Id.* ¶ 48. Parks was handcuffed for at most five minutes and four seconds. *Id.* ¶ 49. Lannutti then told Plaintiffs they were "free to go," remarking, "I appreciate you guys; sorry for the inconvenience." *Id.* ¶ 50.

Parks and Rodriguez drove off first, after which Lannutti and Arias-Garcia drove off separately. *Id.* ¶¶ 51–52. In total, eight minutes and thirty-two seconds elapsed between Lannutti pursuing the Taurus and Lannutti telling Plaintiffs they were free to go. *Id.* ¶ 54.[4]

### 5. *Aftermath*

Neither Rodriguez nor Parks suffered physical injuries as a result of their interactions with Defendants, and neither sought medical attention nor has medical bills related to the incident. Def.

---

[4] Plaintiffs also allege that Parks was detained inappropriately and longer than necessary while Defendants sought Parks' assistance in contacting his mother, Alvin, the target of the warrant. Pl. Opp'n Br. ¶ 20. However, this theory of false imprisonment and unlawful detention was not alleged in the complaint, ECF No. 1, and Plaintiffs may not amend their complaint in a responsive pleading. *Bell v. City of Philadelphia*, 275 F.App'x 157, 160 (3d Cir. 2008).

SMF ¶¶ 55–56; Pl. Resp. to Def. SMF ¶ 55–56. However, Rodriguez claims to have suffered "emotion[al]" and "mental" injuries such as fear of police and of driving by herself, stemming from her fear of being shot by Defendants. Pl. Resp. to Def. SMF ¶ 55. Rodriguez testified that it hurt when Lannutti removed her from her vehicle and that she has ongoing trauma from the incident. *Id.* Likewise, Parks claims to have suffered "mental injuries" such as having "dreams about the incident for two nights" and panic every time he sees a cop car behind him. *Id.* ¶ 56.

### B.    Procedural Background

On January 17, 2025, Parks and Rodriguez filed their complaint. ECF No. 1. The complaint brings claims of excessive force in violation of the Fourth Amendment rights of Parks (Count I) and Rodriguez (Count II), as well as claims of false imprisonment and unlawful detention in violation of the Fourth Amendment rights of Parks (Count III) and Rodriguez (Count IV). On March 16, 2026, Defendants moved for summary judgment on all counts.

## II.    Legal Standard

A movant is entitled to summary judgment if it shows first "that there is no genuine dispute as to any material fact" and second that "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Regarding the first prong, "[g]enuine issues of material fact refer to any reasonable disagreement over an outcome-determinative fact." *In re Energy Future Holdings Corp.*, 990 F.3d 728, 737 (3d Cir. 2021). "A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-26 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–52). Thus, the "mere existence of a scintilla of evidence" in support of the nonmoving party's position is generally insufficient to defeat summary judgment; "there must be

7

evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson*, 477 U.S. at 252. Regarding the second prong, a moving party is entitled to judgment as a matter of law where the "nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex*, 477 U.S. at 323.

When considering a motion for summary judgment, the Court must "view the record and draw inferences in a light most favorable to the non-moving party." *In re Ikon Off. Sols., Inc.*, 277 F.3d 658, 666 (3d Cir. 2002).

### III.    Discussion

Plaintiffs argue that Defendants are liable under 42 U.S.C. § 1983 for violating Plaintiffs' Fourth Amendment rights by using excessive force and falsely imprisoning Plaintiffs. Defendants deny liability on the merits and also contend that they are shielded from liability for the conduct alleged by the doctrine of qualified immunity. The Court agrees with Defendants that qualified immunity precludes Plaintiffs' § 1983 claims. At base, that is because Defendants have met their burden of showing that their conduct did not violate a clearly established right.

### A.    Qualified Immunity in § 1983 Actions, Generally

The doctrine of qualified immunity may shield government officials from liability in § 1983 suits. As the Third Circuit has explained:

> 42 U.S.C. § 1983 . . . provides a cause of action to any individual who has been deprived of his rights under the Constitution or other federal laws by a person acting "under color of law." *Curley v. Klem,* 499 F.3d 199, 206 (3d Cir.2007). "Police officers, embodying the authority of the state, are liable under § 1983 when they violate someone's constitutional rights, unless they are protected by qualified immunity." *Id.* The doctrine of qualified immunity shields government officials who perform discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). The purpose of qualified immunity is to "avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment." *Id.*

*Santini v. Fuentes*, 795 F.3d 410, 416–17 (3d Cir. 2015).

This Court performs a "two-step inquiry to determine whether a particular government official is entitled to summary judgment based on qualified immunity." *Id.* at 417. First, we ask whether the facts—taken in the light most favorable to the nonmoving party—show that a government official violated a constitutional right. *Id.* (citing *Saucier v. Katz,* 533 U.S. 194, 201 (2001)). "This is not a question of immunity at all, but is instead the underlying question of whether there is even a wrong to be addressed in an analysis of immunity." *Curley,* 499 F.3d at 207. Second, we ask whether that right was clearly established at the time of the official's actions. *Santini*, 795 F.3d at 417 (citing *Saucier,* 533 U.S. at 201). This is the immunity analysis, which "addresses whether, if there was a wrong, . . . the officer made a reasonable mistake about the legal constraints on his actions and should . . . be protected against suit[.]" *Curley,* 499 F.3d at 207. "The party asserting the affirmative defense of qualified immunity bears the burden of persuasion on both prongs at summary judgment." *Mack v. Yost*, 63 F.4th 211, 227 (3d Cir. 2023) (cleaned up). Although *Saucier* mandated that its two-step inquiry be performed in sequential order, *Saucier,* 533 U.S. at 201, the Supreme Court subsequently held that courts have discretion to perform the *Saucier* inquiry in the order it deems most appropriate, *Pearson v. Callahan,* 555 U.S. 223, 236, (2009). In sum, to prevail on summary judgment on a qualified immunity theory, Defendants must either show "that there was no genuine dispute of material fact to refute their contention that they did not violate [Plaintiffs'] constitutional rights as [they] asserted them, or show that reasonable officers could not have known that their conduct constituted such a violation when they engaged in it." *Halsey v. Pfeiffer*, 750 F.3d 273, 288 (3d Cir. 2014).

Here, the Court need only elaborate on the "clearly established" prong because the analysis under that prong is dispositive. In analyzing whether the right was clearly established at the time

9

of the official's actions, "we proceed in two steps: we first 'define the right allegedly violated at the appropriate level of specificity' and then 'ask whether that right was clearly established at the time of its alleged violation.'" *Mack*, 63 F.4th at 228 (quoting *Jefferson v. Lias*, 21 F.4th 74, 81 (3d Cir. 2021). The Court next proceeds with those two steps.

### B.    Properly Defining the Rights

#### 1.    Legal Standard

The Third Circuit requires this Court to begin its "clearly established" analysis by

> "fram[ing] the right 'in light of the specific context of the case,'" with all reasonable inferences drawn in the nonmovant's favor. *Peroza-Benitez v. Smith*, 994 F.3d 157, 165-66 (3d Cir. 2021); *accord Tolan v. Cotton*, 572 U.S. 650, 657 (2014) ("Our qualified-immunity cases illustrate the importance of drawing inferences in favor of the nonmovant, even . . . [on] the clearly-established prong of the standard."). The Supreme Court has repeatedly cautioned that the qualified immunity inquiry demands a "high 'degree of specificity'" and that courts may not "define clearly established law at a high level of generality," which would "avoid[ ] the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *District of Columbia v. Wesby*, —— U.S. ——, 138 S. Ct. 577, 590,          199          L.Ed.2d          453          (2018).

*Mack*, 63 F.4th at 228.

The Supreme Court has emphasized that "specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (cleaned up).

#### 2.    Parties' Arguments

Neither party directly argues how the right should be defined. From Plaintiffs' briefing—specifically their reliance on *Couden v. Duffy*, 446 F.3d 483 (2006)—however, it can be deduced that in their view, the right asserted is the right to be free from being forcibly removed from a vehicle, handcuffed, and held at gunpoint by officers who could not reasonably have suspected

10

either of them committed a crime. With regards to Parks, Plaintiffs argue that Defendants could see he was male and thus did not match the description of Alvin, a 43-year-old black female with a face tattoo, who was the target of the warrant. With regards to Rodriguez, Plaintiffs argue that she also did not match the description of Alvin because Rodriguez is a 23-year-old Hispanic female with no face tattoo. Plaintiffs further imply that ordering Rodriguez to lie on the ground after being informed she was pregnant constitutes excessive force.

Defendants counter that the officers did have reasonable suspicion that the vehicle contained an individual, Alvin, who committed a violent crime since the vehicle was registered to Alvin and it is a commonsense inference that the owner of a vehicle is inside the vehicle. To the extent it should have been obvious looking through the vehicle's windows that neither Parks nor Rodriguez matched the description of Alvin, Defendants argue that this would not have been apparent to the officers in the exigence of their pursuit.

### 3. Analysis

As a preliminary matter, the Court agrees with Defendants that the officers had reasonable suspicion to believe that the Taurus contained an individual who was suspected to have committed a violent crime. The reasonable suspicion standard requires an officer to show he or she made the stop based on "more than an 'inchoate and unparticularized suspicion or hunch.'" *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968)). But the standard has been described as "generally undemanding" and requires "considerably less than preponderance of the evidence." *United States v. Delfin-Colina*, 464 F.3d 392, 396–97 (3d Cir. 2006). While officers must provide "specific, articulable facts" to justify their suspicion, *Delfin-Colina*, 464 F.3d at 397, the Court ultimately focuses on the "totality of circumstances," *Kansas v. Glover*, 589 U.S. 376, 386 (2020), to assess how the officer acted based on the information

11

possessed at the time of the stop, taking into account the "practical considerations of everyday life," *id.* at 380. As relevant here, the Supreme Court has held that officers may have reasonable suspicion to stop a vehicle registered to a suspected criminal, even without visually confirming the vehicle's occupants, based on the commonsense inference that the owner of a vehicle is likely inside. *Kansas v. Glover*, 589 U.S. 376, 381 (2020). In *Glover*, the Supreme Court determined the stop was reasonable even though the officer made no effort to determine the identities of the passengers. *Id.*

Here, Defendants clear the low bar of reasonable suspicion. The registered owner of the Taurus was wanted on serious felony charges, and at the time of the stop, Defendants possessed no information sufficient to rebut the reasonableness of the inference that Alvin was in the vehicle. The parties agree that it was dark out and that the Taurus' windows were up and dark. Even making all inferences in Plaintiffs' favor and presuming the officers may have been able to determine characteristics such as the age and ethnicity of the vehicle's occupants, that does not make it unreasonable, in the heat of the pursuit, for the officers to determine that a closer inspection was needed to ensure a violent criminal did not escape their grasp. Furthermore, Plaintiffs have presented no evidence that Defendants had a photograph of what Alvin looked like, let alone been able to quickly distinguish her from Rodriguez so as to overcome the inference that Alvin was in the vehicle. That the Taurus was registered to Alvin is a "specific, articulable fact[]" justifying Defendant Lannutti's suspicion that she was in the vehicle. That a male, Parks, was in the car too, does not change this fact.

Reasonable suspicion being established, the Court identifies two rights being asserted and frames them as follows:

12

(1) The right of an individual to be free from being forcefully removed from his or her vehicle, handcuffed, and held at gunpoint by officers who have reasonable suspicion that the individual is either wanted for committing a violent crime or is accompanied by said person; and

(2) The right of a pregnant individual to be free from being forcefully removed from her vehicle and made to lie on the ground by officers who have reasonable suspicion that the individual is wanted for committing a violent crime.

## C.      Whether those Rights were Clearly Established

### 1.      Legal Standard

Having defined the rights, the Court must next decide whether those rights are "sufficiently clear that a reasonable official would understand that what he is doing violates th[ose] right[s]." *Peroza-Benitez*, 994 F.3d at 165 (internal quotation marks omitted). As the Third Circuit has elaborated:

> That is "an objective (albeit fact-specific) question, where an officer's subjective beliefs are irrelevant." *Peroza-Benitez*, 994 F.3d at 165 (cleaned up). A right is clearly established if there is either "closely analogous" caselaw establishing that a defendant's conduct was unlawful or "evidence that the Defendant's conduct was so patently violative of the . . . right that reasonable officials would know [it to be a violation] without guidance from a court." *Schneyder v. Smith*, 653 F.3d 313, 330 (3d Cir. 2011). We take a "broad view" of what makes a right clearly established, which can be satisfied "even without a precise factual correspondence between the case at issue and a previous case." *Peroza-Benitez*, 994 F.3d at 166 (internal quotation marks omitted). It is enough that "existing precedent . . . placed the statutory . . . question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011); *accord Williams v. Bitner*, 455 F.3d 186, 192 (3d Cir. 2006) ("[I]f the unlawfulness of the defendant's conduct would have been apparent to a reasonable official based on the current state of the law, it is not necessary that there be binding precedent        from        this        circuit        so        advising.").

*Mack*, 63 F.4th at 231–32. This standard acknowledges the reality that "reasonable mistakes can be made as to the legal constraints on particular police conduct." *Curley,* 499 F.3d at 207 (quoting *Saucier,* 533 U.S. at 205) (internal quotation marks omitted).

Of additional note is the fact that the Third Circuit has recognized that, "[a]n officer with reasonable suspicion that the occupants of a vehicle are armed and dangerous does not act unreasonably by drawing his weapon, ordering the occupants out of the vehicle, and handcuffing them until the scene is secured." *United States v. Johnson*, 592 U.S. 442, 453 (3d Cir. 2010).

        2.      *Analysis*

The Court is convinced that the asserted rights—whether or not they are rights at all—were not clearly established at the time of the incident. Defendants have carried their burden of showing both that there is no closely analogous caselaw establishing the unlawfulness of their actions and that Defendants' conduct was not so patently unlawful that they would know it to be so without guidance from the Court. *See Mack*, 63 F.4th at 231–32. At base, the potential dangerousness of the stop Defendants engaged in afforded Defendants considerable discretion in their treatment of the vehicle's occupants, and there has been no showing that Defendants clearly acted outside the bounds of this discretion.

Plaintiffs' sole reliance on *Couden v. Duffy*, 446 F.3d 483 (3d Cir. 2006) as clearly establishing the law governing the appropriate use of force in cases such as this one is unpersuasive. In *Couden*, law enforcement officers set up undercover surveillance outside a home in the hopes of catching a fugitive wanted for drug and weapons offenses. 446 F.3d at 489. During the surveillance, plaintiff-appellant Pamela Couden, who lived near the target house, pulled up in front of her home. *Id.* Couden's 14 year-old son got out of the car to leave his skateboard in the garage and to summon his sister from the house. *Id.* Not realizing they had the wrong person, the

14

officers approached the Couden car with guns drawn and entered the Couden home where they tackled and handcuffed Couden's son. *Id.* The Coudens filed suit, claiming constitutional and state common law violations. *Id.* The Third Circuit held that the officers were not entitled to qualified immunity because the reasonable suspicion standard was not met:

> [A] young man exiting a car parked near a house, walking from the car into the garage of the house while carrying a skateboard and then looking into a window of the house, and the car then driving into the driveway of the house, turning on its brights, and honking—do not provide the reasonable suspicion of illicit activity necessary for a *Terry* stop. There is simply nothing suspicious in this series of actions, and plaintiffs have not pointed to any legal authority that might cloud the issue.

*Id.* at 495–96. That fact alone is enough to distinguish the present matter: *Couden* does not speak to the appropriate use of force in situations where officers *do* have reasonable suspicion, let alone clearly establish the law on such an issue.

While the precise amount of force used by the officers is a matter in dispute not captured by the MVR footage, even when interpreted in Plaintiffs' favor, the facts do not paint a picture of the officers violating clearly established law. Plaintiffs assert that Lannutti "yanked [Rodriguez] . . . out of the vehicle by her right arm and threw-pushed her onto the middle lane of highway I-76 while pointing his gun at her head." Pl. Resp. to Def. SMF ¶ 25. Likewise, Plaintiffs assert that Arias-Garcia "aggressively pulled and dragged" Parks out of the vehicle with a gun pointed at his head "causing him to fall on the highway." Pl. Opp'n Br. 11. The Court recognizes that Plaintiffs' allegations suggest they experienced circumstances they felt were tense, violent, demeaning and traumatizing, particularly given that Rodriguez was pregnant. Nevertheless, it is also true that simply because an officer acted aggressively does not mean that officer violated clearly established law. This is especially true when the officer had reasonable suspicion that Plaintiffs were armed. While an officer's reasonable suspicion does not authorize unlimited uses of force, the discovery

process has not borne out any evidence that the complained of force utilized in this case and under these circumstances could clearly be labeled as excessive. Thus, the dispute about the amount of force used by Defendants does not create a genuine issue of *material* fact that precludes summary judgment. Since Defendants are entitled to qualified immunity as a matter of law, their motion for summary judgment must be granted.

**CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment is granted. An appropriate order follows.

**IT IS SO ORDERED.**

BY THE COURT:

*/s/ John Milton Younge*

**Judge John Milton Younge**